The H. & T. C. R'y Co. v. J. L. & L. P. Smith

(Case No. 5741.)

1. RAILWAY COMPANIES.— By articles 2226 and 2227, Revised Statutes, a duty is imposed on railway companies to furnish sufficient transportation to carry all property offered, though when the carrier, from an unexpected and unprecedented press of business, is unable to do so, this, in general, will furnish a legal excuse for refusing to accept freight.

2. SAME.— Railway companies derive their charter rights from the state, and owe an equal duty to every citizen, and they cannot exercise their charter rights in such manner as to benefit one individual, town or community, to the detriment of another.

3. Same.—Railway companies must take and transport property in the order in which it is offered, and they cannot exercise partiality in accepting the property tendered by some, and rejecting that offered by other persons. If this rule is violated the company is liable for all damages resulting therefrom.

4. Measure of damages.—When the company wrongfully refuses to take produce offered for shipment, it is the duty of the owner to take care of and protect his property while delayed, and for the expense thus incurred the company is liable. It is also liable for the loss occasioned by delay in getting the produce to its market place of destination, to be estimated by ascertaining its price there, when it should have arrived, had it been taken when offered, and its price at the time when it did arrive.

Appeal from Limestone. Tried below before the Hon. L. D. Bradley.

August 14, 1882, appellees brought this suit to recover damages for the failure and refusal of appellant to transport cotton as it was tendered, etc. The amount of damages claimed aggregated $21,112.68. The following is the statement of the case by appellees' counsel, which is sufficiently accurate, and is the statement made by the commission of appeals to the supreme court:

The appellees, in the years 1880 and 1881, were engaged in the purchase of cotton at the town of Mexia, in Limestone county, Texas, on the line of appellant's road, during the cotton season, beginning August 14, 1880, and ending March 1, 1881. They bought during this time nineteen hundred and fifty-eight bales of cotton, three hundred and eleven of which were sold by appellees at the town of Mexia, at a loss of $5 per bale. Appellees' cotton was tendered daily for shipment, they offering to pay the freight in advance, which was declined by the agent, and the agent of appellant refused to receive the cotton itself. The agent never accepted freight on cotton in advance at Mexia from any one.

The appellant having failed to receive appellees' cotton when tendered, a large part of it was damaged by being put upon the ground in pens near the depot, in Mexia. The appellant, in order to monopolize the carrying trade, gave preference to all cotton coming from territory that could, with equal or greater facility, ship over the International Railroad, and inclosed its platform or shipping wharf, and for a considerable period of time during the cotton season in 1880 and 1881, excluded from its platform all cotton bought in Mexia. Appellees' cotton was not shipped by appellant in the order in which it was presented, and an unreasonable preference was given to cotton coming from competing points; appellees' cotton was left upon the ground in pens designated by the

agent of appellant, and was damaged by its exposure to weather, and appellees suffered other damages in consequence of the delay in shipment.

Damages were claimed:

1. For the sum of $1,339.82, which represented the amount of interest paid by appellees upon money invested in cotton which appellant refused to accept, and thereby delayed the sale of said cotton, and said amount was the interest paid by them over and above the amount they would have had to pay had the appellant shipped their cotton promptly when delivered.

2. For the sum of $82 insurance, paid by appellees on cotton which appellant refused to accept, and being an amount in excess of what they would have had to pay if the cotton had been accepted and transported promptly when tendered, an itemized statement of said amount being set forth in exhibit " C."

3. For $9,790, which was for the actual damage done to the cotton by its exposure to bad weather for a considerable time and its consequent deterioration in grade and quality, said exposure being the direct result of appellant's failure to receive and transport said cotton in the order in which it was presented, and within a reasonable time after its tender.

4. For $651.56, which was the difference in price of the muddy, damaged and half-rotted cotton on the outside of the bales, and the market value of a similar amount uninjured by rain and mud, such cotton being denominated " pickings" in commercial circles. An itemized statement of this element of damage was set forth in exhibit " D."

5. They sued for $8,235, which represented the amount of loss on one thousand six hundred and forty-seven bales sold by appellees on a declining market, and was the difference between the value of cotton of like grade and quality in Galveston, Houston and New Orleans (the markets to which appellees desired to have it shipped), in the proportions shown by exhibit B, at the time at which it was tendered for shipment and its value in those markets when actually shipped and received.

6. They sued for $1,014, which represented the depreciation in value of three hundred and thirty-eight bales of cotton shipped by appellees to New York by the advice of appellant. This item was set forth in exhibit " E."

The appellees alleged that sundry persons from Freestone county brought their cotton to Mexia, and that appellant received their cotton and shipped the same promptly, to the exclusion of appellees'

cotton, which was being tendered to appellant all the time, and that their cotton was shipped out of the order in which it was presented.

Appellant answered by general and special exceptions (which were overruled) and also by general denial, and special pleas not necessary to be noticed.

A jury was waived and the cause was tried by the court. Judgment was rendered against appellant for $6,572.16. The several items of damage allowed by the court, which taken together aggregated the amount of the judgment, were:

1. Two thousand six hundred and seventy-five dollars actual damages, by exposure to bad weather, of five hundred and thirty-five bales of cotton.

2. Loss on pickings, $651.56.

3. Loss by decline in value of five hundred and thirty-five bales of cotton, $1,690.60.

4. Loss on three hundred and eleven bales of cotton, of the sum of $1,555.

*Geo. Goldthwaite*, for appellant.

*L. J. Farrar*, for appellees.

Watts, J. Com. App.— This is an action against the railroad company to recover damages for refusing to accept and transport cotton to market in the order it was tendered.

As authority for the proceeding, article 279, Revised Statutes, is cited by appellees, which in effect provides that the carrier shall receive and transport property tendered, on the trip or voyage then pending, provided that the vehicle or vessel has capacity safely to carry the same. And a refusal upon the part of the carrier, under such circumstances, to take and transport property as stated in the order presented, renders the carrier liable for the damages sustained thereby, to the injured party, and also to a penalty of from five to five hundred dollars. From which it will be observed that this article only applies to the trip or voyage then pending. And if it is made to appear that the vehicle, vessel or other means used by the carrier for that purpose did not have the capacity to transport safely the property tendered, that would be a sufficient answer to the suit to recover either the damages or penalty.

In cases where the carrier has received the property tendered for transportation, then it is the duty of the carrier to forward the property in the order in which it was received, and without giving the preference to one over another. And a failure to discharge that

duty subjects the carrier to a suit for all damages occasioned or in any wise resulting from the delay. R. S., art. 283; Gen'l Laws 1883, p. 69, sec. 8.

This case, however, does not come within the operation of that rule, for here the carrier refused to *receive* the cotton when it was tendered, and gave as a reason therefor that there was a want of capacity in the means of transportation to remove the cotton as it was presented at that station.

By art. 4226, Revised Statutes, it is provided that "Every such corporation shall start and run their cars for the transportation of passengers and property at regular times, to be fixed by public notice, and shall furnish sufficient accommodations for the transportation of all such passengers and property as shall, within a reasonable time previous thereto, offer or be offered for transportation at the place of starting, and the junction of other railroads, and at sidings and stopping places established for receiving and discharging way passengers and freights, and shall *take*, transport and discharge such passengers and property at, from and to such places on the d payment of the tolls, freight or fare legally authorized therefor."

And article 4227 provides that "In case of refusal by such corporation or their agents so to take and transport any passenger or property, or to deliver the same, or either of them, at the regular or appointed time, such corporation shall pay to the party aggrieved all damages which shall be sustained thereby, with costs of suit."

A general duty is here imposed upon the railroad company to furnish sufficient accommodations for the transportation of all property that may be offered. This is, however, but declaratory of the common law liability of carriers. Aside from these statutory provisions it would be the duty of the carrier to provide all necessary facilities and means for transporting such property as might be offered, at least to the extent that would ordinarily be expected to seek transportation by the particular line. When an unexpected and unprecedented press of business occurs, the carrier is generally excusable for refusing to accept the property for transportation. Hutchinson on Carriers, section 292, and authorities cited.

But it would seem that the legislative intent, as expressed in the above quoted article and other provisions of the Revised Statutes, would require of the railroad company to accept in good faith, and ship in the order in which it is tendered, all property for transportation. Not, however, that the company must accept at the time the offer is made, whether it has the capacity to then transport the property or not. But if, by unprecedented and unexpected press of

business, the company has already received more property than it can then transport, and the warehouses at the point are full and the company has no present means of taking care of the property offered, then it would be unreasonable to hold that under such conditions the company must accept the property when offered, or else incur the liability prescribed by the statute.

The leading idea, and the one that seems most prominent in our legislation upon the subject under consideration, is that of equality. Railroads are declared public highways, and railroad companies common carriers, by the constitution. It is also declared by the constitution that the legislature shall pass laws to correct abuses and prevent unjust discriminations, etc.   Art. X, sec. 2, Constitution.

These railroad companies derive their chartered rights from the state; and they owe an equal duty to each citizen. Having secured from the state extraordinary rights and privileges, they ought not to be permitted to exercise them in such manner as to benefit one individual, town or community to the detriment of another. In the exercise of the duties which relate to the public, these companies must, upon general principles, deal alike with all customers.

Generally they are required to furnish themselves with sufficient facilities to transport promptly all property which may be tendered at reasonable times.   And the statute is imperative, they must *take* and transport the property in the order in which it is offered.   And having the means to transport all the property which may be offered, they are not permitted to select, upon the grounds of favoritism or otherwise, from among those who may apply, some, and reject others.

It has been seen that if, on account of an unprecedented and unexpected press of business, the company may, for the want of sufficient facilities, be unable to transport all the property offered at the time, that this may constitute a sufficient excuse for failing to accept and transport the property at the time it is offered.   But the company will not be allowed to take advantage of such a condition, so as to extend advantages to one customer to the injury of another.   It must, under such circumstances, as at all other times in dealing with the public, act upon the rule of equality.   To permit the company to take advantage of a press of business to deal out favors to certain customers to the detriment of others, might result in perpetuating that condition upon the line.   For instance, suppose the property offered for transportation by other customers was more than could be transported promptly by the particular line, that would not anthorize the company to refuse to *take* and *transport*, in the order

tendered, the property of others, as soon as this could be reasonably done.

In this case it appears that while the company declined to *take* and transport the cotton of appellees as offered, that during the same period it did *take* and transport cotton for others as it was tendered. That in this way, while the cotton of other parties was *taken* and promptly transported to market, that of appellees, although at all times ready for shipment, was unreasonably delayed, to their damage.

Such favoritism and discrimination is prohibited by the statute, and the company is certainly liable to appellees for all damages sustained thereby.

Then the question recurs as to what rule shall apply in the measurement of such damages. The spirit and intent of the statute is to furnish compensation for the injury. One of the items of damage allowed by the court below is $2,675 actual damages sustained by reason of the exposure of five hundred and thirty-five bales of the cotton to wet weather. It is not claimed that this injury occurred while the cotton was in the custody of the company, but that when the company declined to take it, appellees having no warehouse or other secure place, put the cotton in open pens, where it was exposed to the weather and was injured.

Now, admitting that the company was at fault in refusing to *take* and transport the cotton when tendered, that did not authorize appellees to abandon the property, and expect others to take care of it for them. Until it passed from their possession, the duty devolved upon them to take care of and preserve their property, and injury resulting from a failure to do this will be chargeable to appellees, and not the company.

Where the company wrongfully refuses to take and transport property when it is offered, the party must take care of and preserve the property while it is thus delayed. But he will be entitled to recover of the company the reasonable expenses incurred in this respect. However, there is no proposition better established than that no one can recover damages occasioned by his own neglect. Here the damage to the cotton is shown to have been occasioned by the negligence of the appellees, and was therefore improperly awarded against the company.

And the same is true in respect to the item of $651.56, loss on pickings. This injury is shown to have resulted by reason of the negligence of appellees in exposing the cotton to the weather.

The court also allowed appellees, as an item of damage, $1,555, as

a loss on sale of three hundred and eleven bales of cotton at Mexia. It appears that this cotton was sold because the company failed to take and transport it to market; and that, owing to the delay, there was a loss occasioned to appellees of $5 per bale by reason of a decline in cotton. In a case where, by the wrongful act of the company, the cotton is not shipped as offered, and is thereby delayed in getting to market the measure of damages would ordinarily be the difference between the market value of that *grade* of cotton, at the time when it should have arrived in market, and the market value of the same *grade* of cotton at the time that it did arrive.

Therefore, it seems that the $1,555 was a proper item of damages to be awarded in this case. For, by reason of the delay caused by the wrongful act of the company, there has been, without their fault, an actual loss of $1,555 occasioned to appellees upon that lot of cotton. That, then, is simply compensation.

Another item of damage allowed to appellees is $1,690.60 loss on five hundred and thirty-five bales of cotton, occasioned by the decline in the market value of the same. It appears that, during the time this cotton was delayed by the wrongful act of the company, there was a decline in the market, so that appellees incurred an actual loss of the amount named in the sale of the five hundred and thirty-five bales. This item was properly awarded to appellees by the court below. In addition to the rule for the measure of damages announced above, the appellees would have been entitled to their reasonable expenses in taking care of and preserving from damage the delayed cotton, but the amount thus incurred is not shown.

Our conclusion is that the judgment of the court below ought to be reversed, and that the supreme court ought now to render such judgment as should have been rendered by the court below, viz.: That appellees J. L. & L. P. Smith have and recover of and from the appellant "The Houston and Texas Central Railway Company," the sum of $3,245.60, with interest thereon at eight per cent. per annum from the date of the judgment below, to wit, October 3, 1883, and all the costs incurred in the court below; and that appellant have and recover of appellees the costs incurred in this court.

REVERSED AND RENDERED.

[Opinion adopted February 24, 1885.]