[S. F. No. 18859.   In Bank.   Nov. 6, 1953.]

BERT LANGLEY, Respondent, v. PACIFIC GAS AND
ELECTRIC COMPANY, Appellant.

657

Robert H. Gerdes, Campbell, Custer, Warburton & Britton, W. R. Dunn and Austen D. Warburton for Appellant.

Louis W. Myers, as Amicus Curiae on behalf of Appellant.

James F. Boccardo and Edward J. Niland for Respondent.

TRAYNOR, J.—Plaintiff Bert Langley brought this action against defendant Pacific Gas and Electric Company for breach of a contract wherein defendant allegedly agreed to furnish plaintiff with power necessary to operate plaintiff's fish hatchery, and in the event that delivery of power was suspended, to give reasonable notice of such suspension to plaintiff. The evidence at the trial established that a power failure occurred, that defendant did not give plaintiff notice of such failure, and that as a result 78,000 of plaintiff's trout died. Plaintiff recovered judgment for $12,480 pursuant to a jury verdict. Defendant appeals, contending that it did not breach any contractual duty to plaintiff and that the trial court erroneously instructed the jury.

Plaintiff built his hatchery in 1947. At the time of the accident he had about 80,000 trout, in seven concrete troughs, 16 feet long, 16 inches wide, and 8 inches deep. It was necessary to have a continuous flow of running water in the troughs to supply oxygen to the trout. If the flow of water were cut off, the trout would die in from 20 to 30 minutes. Plaintiff supplied water to the troughs by gravity flow from a reservoir that was kept full by an electric pump. The pump would automatically start and refill the reservoir when the water dropped to a certain level. The reservoir contained enough water to supply the troughs for about three and a half hours after the pump stopped. Plaintiff

did not have a standby pump at the hatchery. If the power were shut off or the pump failed for any other reason, plaintiff was prepared to protect the trout in two ways. He could lessen the flow of water from the reservoir to the troughs, so that the water would not be exhausted until about eight hours had passed. If it appeared that the pump could not be operated within that time, he had made arrangements for getting a portable gasoline power plant and pump within an hour.

In 1947 plaintiff made arrangements with defendant for his power supply. Plaintiff testified that he told defendant's employees the nature of his business and of his need for a continuous supply of running water. He asked whether "you people have a man here, or service 24 hours a day, whereby I could receive notice in the event that there is to be a suspension of power. . . . Otherwise, I will put in a gasoline pump." The employees orally assured plaintiff that he would be notified. Defendant began supplying plaintiff with power in October, 1947. Apparently a written contract was signed, although neither party produced it or a copy thereof at the trial. Early in 1948 plaintiff read in a newspaper that there was a power shortage. He told one of defendant's employees that he wished to be notified when there was a "brownout" and his power was cut off. He gave the employee his telephone number. On two occasions he received a notice from an employee, who stated that she had instructions to notify him when power was suspended, that on a certain date on a certain hour power would be suspended in his area, and that he should govern himself accordingly. Plaintiff took appropriate precautions.

In the spring of 1948 plaintiff substituted a three horsepower electric motor for the smaller motor that he had previously used. He asked defendant to supply him with additional power. On May 12, 1948, he signed a written agreement for the additional power at a rate different from that under the former arrangement. The agreement provided that defendant would furnish the electricity in accordance with the applicable rules and regulations of the Public Utilities Commission. Rule 14 of the commission, relied upon by defendant, is set forth in the footnote.* It is not clear from the record

---

*"SHORTAGE OF SUPPLY AND INTERRUPTION OF DELIVERY

"The Company will exercise reasonable diligence and care to furnish and deliver a continuous and sufficient supply of electric energy to the customer, but does not guarantee continuity or sufficiency of supply.

whether at the time this contract was executed defendant's employees renewed their oral assurance that plaintiff would be given notice if the power failed; in any event, he assumed that the previous oral agreement was still in effect.

Power failed in plaintiff's area at some time before 12:01 a. m. on July 5, 1951. At 12:01 a. m. an unknown person called the telephone operator at defendant's office and informed her that the power was off. The operator promptly called the repair crew. Defendant's employees patrolled the area until they located the cause of the failure, a nonoperating voltage regulator. They by-passed the regulator and restored service at about 5:15 a. m. Defendant's employees did not at any time notify plaintiff that the power had failed. Plaintiff was at home that night and would have answered the telephone had he been called. When plaintiff arrived at the hatchery the following morning, 78,000 of his 80,000 trout were dead.

Plaintiff brought this action for breach of an "oral and written" contract whereby defendant allegedly promised to give him reasonable notice in the event that it was necessary to suspend delivery of electricity. Plaintiff took the position at the trial that the cause of the power failure was immaterial, and in effect conceded that defendant had exercised due diligence in supplying him with electricity and in restoring service after the failure. Defendant's motion for judgment on the pleadings, a nonsuit, and a directed verdict were denied, and the cause was submitted to the jury. The jury returned a verdict in favor of plaintiff, awarding damages at $12,480. Defendant's motions for judgment notwithstanding the verdict and for a new trial were denied. Defendant appeals from the judgment entered on the verdict.

Defendant contends that the trial court should not have

---

The Company will not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind or character occasioned thereby, if same is caused by inevitable accident, act of God, fire, strikes, riots, war, or any other cause except that arising from its failure to exercise reasonable diligence.

"The Company, whenever it shall find it necessary for the purpose of making repairs or improvements to its system, will have the right to suspend temporarily the delivery of electric energy, but in all such cases, as reasonable notice thereof as circumstances will permit, will be given to the customers, and the making of such repairs or improvements will be prosecuted as rapidly as may be practicable, and, if practicable, at such times as will cause the least inconvenience to the customers."

See 44 C.R.C. 718, 719; 17 C.R.C. 143, 154.

admitted evidence of the oral negotiations and agreements preceding execution of the written contract on May 12, 1948, on the grounds that this instrument must be deemed to be the complete expression of the agreement of the parties, and that parol evidence is therefore inadmissible to vary or contradict its terms. (See *Guerin* v. *Kirst,* 33 Cal.2d 402, 410 [202 P.2d 10, 7 A.L.R.2d 922] ; *Miller* v. *Security-First Nat. Bank,* 219 Cal. 120, 128 [25 P.2d 420] ; *Parker* v. *Meneley,* 106 Cal. App.2d 391, 399 [235 P.2d 101].) Plaintiff, on the other hand, contends that evidence of the oral agreement in the present case was properly admitted, relying on the rule that the parol evidence rule does not "render inadmissible proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where the latter is either incomplete or silent on the subject, and the circumstances justify an inference that it was not intended to constitute a final inclusive statement of the transaction." (*Ellis* v. *Klaff,* 96 Cal.App.2d 471, 476 [216 P.2d 15] ; *Stockburger* v. *Dolan,* 14 Cal.2d 313, 317 [94 P.2d 33, 128 A.L.R. 83] ; *Crawford* v. *France,* 219 Cal. 439, 443-445 [27 P.2d 645].) It is unnecessary, however, to resolve these contentions if it is determined that under the written contract defendant assumed the duty to exercise reasonable diligence to notify plaintiff of any interruption in the supply of power. Accordingly, the first question presented for determination is the extent of defendant's obligations under the written contract.

■ As noted above, defendant agreed to furnish electricity in accordance with the applicable rules and regulations of the Public Utilities Commission. Rule 14 requires defendant to exercise "reasonable diligence and care" to furnish a continuous and sufficient supply of electricity to its customers. It further provides that defendant shall "not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind or character occasioned thereby . . . except that arising from its failure to exercise reasonable diligence." Defendant contends that under these provisions its duty is limited to exercising reasonable diligence to furnish a continuous and sufficient supply of electricity, and that it is under no duty to exercise reasonable care or diligence to prevent loss from power failure when it is not legally responsible for the power failure itself. These provisions deal with the duty to supply power, and they make clear that defendant is not an insurer or guarantor of service. In no way, however, do they abrogate defendant's general

duty to exercise reasonable care in operating its system to avoid unreasonable risks of harm to the persons and property of its customers. (See Pub. Util. Code, § 451.)

In the present case it is undisputed that defendant was not responsible for the power failure and that it exercised reasonable diligence to restore service. Accordingly, the question presented is whether on the record before us it could reasonably be concluded that its duty to exercise due care toward plaintiff in the operation of its system required it to give notice of the power failure when it knew that the failure to give notice would result in serious loss. In an analogous situation, a common carrier does not have a duty to transport goods immediately, but merely to use diligence to deliver goods offered for shipment within a reasonable time in view of all the circumstances. Nevertheless, it is the general rule that if the carrier is aware that causes of unusual delay exist of which the shipper is unaware, and does not inform the shipper of the facts, the carrier is liable for injuries caused by delay that would otherwise be excusable. (*Eastern Railway Co.* v. *Littlefield,* 237 U.S. 140, 145 [35 S.Ct. 489, 59 L.Ed. 878] ; *Joynes* v. *Pennsylvania R. Co.,* 235 Pa. 232, 237 [83 A. 1016] ; *Southeastern Express Co.* v. *Bowers, Inc.,* 21 Tenn.App. 295 [109 S.W.2d 851, 854-855] ; see, 4 Williston on Contracts, § 1095, p. 3074.)

In the present case, defendant knew that a continuous supply of electric current to plaintiff was imperative. It knew that it could assure that supply either by furnishing the current itself or by promptly notifying plaintiff of any failure so that he could obtain a substitute supply. Twice, in fact, defendant did notify plaintiff of an interruption in its service. Plaintiff had given defendant his telephone number. The repairman who restored service was called to duty by a night telephone operator at defendant's office. Had that operator been given a list of customers to call in the event of a power failure, the loss to plaintiff would have been averted. Under these circumstances defendant failed to exercise reasonable care toward plaintiff.

Defendant contends, however, that it is physically impossible for it to first ascertain the loss that may occur to each of its million customers in the event of a power failure, and then to take steps, other than diligent efforts to restore service, to diminish or prevent such losses. Defendant is under no duty to do so. In the absence of knowledge

of the particular needs of a customer, a utility is not required to give notice of a power failure. (*Brame* v. *Light, Heat & Water Co.*, 95 Miss. 26, 33 [48 So. 728] ; *Stroup* v. *Alabama Power Co.*, 216 Ala. 290 [113 So. 18, 20, 52 A.L.R. 1075].) If it has such knowledge, it is required only to act in a reasonable manner under the circumstances. ■ It would not be unduly burdensome to a utility, at least in a case where, as here, a telephone operator is on duty and the utility has actual knowledge of the power failure, to require it to make a reasonable effort to give notice to those customers who have informed it that they require notice to prevent serious loss in the event of an interruption in the power supply.

■ Defendant contends that to require it to give notice to certain customers and not to others conflicts with the public policy of this state that no public utility may grant any preference or advantage in its service to its customers. (Pub. Util. Code, § 453.) Discrimination is not present however, since the same duty to exercise reasonable care and diligence is owed to all customers similarly situated. (See *Humphreys* v. *Central Kentucky Natural Gas Co.*, 190 Ky. 733, 740 [229 S.W. 117, 21 A.L.R. 664].)

Defendant contends that unless the duty to give notice is expressly provided for in its contract with plaintiff, recovery cannot be had in an action on the contract but only in an action in tort for negligence. ■ By undertaking to supply electricity to plaintiff, defendant obligated itself to exercise reasonable care toward him, and failure to exercise such care has the characteristics of both a breach of contract and a tort. ■ For certain purposes, such as the statute of limitations, whether an attachment may issue, and the measure of damages, it may be necessary to classify an action such as this one as in contract or in tort. (See generally, *L. B. Laboratories, Inc.* v. *Mitchell*, 39 Cal.2d 56, 61-63 [244 P.2d 385].) In the present case, however, it is immaterial whether the failure to exercise reasonable diligence to notify plaintiff be treated as a breach of contract or a tort. The action was brought within the period of the shortest applicable statute of limitations, and since defendant knew of the loss that might result from its failure to give notice, the measure of damages under either theory is the same. (Civ. Code, §§ 3300, 3333; see *Siminoff* v. *Jas. H. Goodman & Co. Bank*, 18 Cal. App. 5, 15, 18 [121 P. 939].) Accordingly, whether or not plaintiff erred in pleading defendant's failure to give notice as a breach of contract rather than as negligence, defendant

was not prejudiced. Under either theory it was under a duty to exercise reasonable diligence to notify plaintiff of the power failure.

■ In addition to instructing the jury on the theory that defendant was under a duty to exercise reasonable diligence to give notice, the trial court gave instructions with respect to the alleged oral promise that bound defendant to give notice. On either theory the jury, in returning a verdict for plaintiff, necessarily found that defendant was aware of plaintiff's need for notice of a power failure, that it failed to give him notice, and that its failure was the proximate cause of the death of the trout. It is undisputed that defendant knew of the power failure and made no effort to notify plaintiff. Under these circumstances defendant failed to exercise reasonable care and diligence, and any error in instructing with respect to the oral agreement was not prejudicial. (*Heple* v. *Kluge,* 114 Cal.App.2d 473, 482-483 [250 P.2d 694].)

■ Defendant contends that the instruction that if the jury returned a verdict in favor of plaintiff, "you cannot award the plaintiff any less than sixteen cents per fish," was prejudicially erroneous. We agree. The amount of damages sustained by plaintiff was placed in issue by the answer to the complaint. The instruction removed that issue from the consideration of the jury. Although plaintiff's testimony was the only evidence concerning the value of the fish, the jury was the sole judge of his credibility and should have been left free to disbelieve him. (*Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868].) On cross-examination it was shown that plaintiff was not experienced in the business of raising fish. The erroneous instruction on the issue of damages does not require a complete new trial, since the verdict of the jury on the issue of liability is amply supported by the evidence.

The judgment is reversed and the trial court is directed to retry the issue of damages only. Each party is to bear its own costs on appeal.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—I concur in the conclusion that the instruction concerning the measure of damages was prejudicially erroneous, but I dissent from the order directing that a new trial be limited to the issue of damages only.

The complaint alleged that the "plaintiff and the defendant entered into an oral and written contract, whereby defendant agreed to furnish to plaintiff the necessary power for the operation of plaintiff's fish hatchery, and further agreed that in the event it was necessary to suspend temporarily the delivery of electric energy, said defendant would give a reasonable notice to plaintiff. . . . That on or about the 4th of July, 1948, defendant without warning to plaintiff did cause an interruption in the supply of electrical power to plaintiff's fish hatchery, and that as a direct result thereof and before plaintiff could take the necessary steps for the protection of the fish contained in said fish hatchery, some 78,000 rainbow trout died from lack of fresh water."

These allegations state no cause of action either in contract or in tort. They include no statement that the power company did not give notice, as it assertedly promised to do, nor do they charge it with any failure to exercise reasonable diligence.

The case was tried upon the theory that the power company was liable under the terms of the oral contract relied upon by Langley. As stated by his counsel in resisting a motion for a judgment on the pleadings, "The issue is simple. There was an agreement to give this man notice that the power was disconnected; the power was disconnected, and he wasn't given notice. I don't know how else you could say it." Similar statements were made by him in his opening statement to the jury, in his closing argument, and in resisting a motion for a directed verdict. In connection with this last proceeding, counsel for the power company asked: "In order that we may put in our defense, will the Court indicate the theory upon which we may be held liable?" The court's reply was: "The plaintiff's testimony shows . . . the plaintiff's claim of an oral agreement."

The issue of the power company's liability was submitted to the jury under alternative theories of recovery. By one instruction, the jurors were told: "In addition to the terms of the written contract, there is evidence of an oral agreement between the parties providing for the giving of notice to the Plaintiff by the Defendant in the event of any interruption of power. If you find that such an agreement existed, the duty and obligation of the Defendant to give such notice cannot be excused by any circumstances, and if you find that the defendant made such an agreement and then failed to fulfill it and,

as a result thereof, the Plaintiff sustained damage, your verdict must be in favor of Plaintiff. . . ."

A rule of the Public Utilities Commission which, by statute was a part of the written contract for service to Langley, stated the duties of the company in the event of an interruption in the delivery of power. The contract, as enlarged by the rule, provided for the very contingency which is the basis of the cause of action, and parol evidence was not admissible to prove a collateral oral agreement relating to the same subject. (*Kunz* v. *Anglo & London Paris Nat. Bank*, 214 Cal. 341, 346-347 [5 P.2d 417]; *Pacific States Securities Co.* v. *Steiner*, 192 Cal. 376 [220 P. 304]; *Heffner* v. *Gross*, 179 Cal. 738, 742 [178 P. 860]; *United Iron Works* v. *Outer H. etc. Co.*, 168 Cal. 81, 84-85 [141 P. 917]; *Germain Fruit Co.* v. *J. K. Armsby Co.*, 153 Cal. 585, 594 [96 P. 319].) Accordingly, evidence as to a contemporaneous oral agreement was erroneously admitted, and an instruction upon that theory should not have been given.

The jurors were also instructed that by the written contract of the parties, the power company was liable for any loss or damage occasioned by the interruption of power if such loss or damage was caused by the failure to exercise reasonable diligence. They were told that, in appraising the conduct of the company, they should determine whether it knew of the hazardous nature of Langley's business and whether it reasonably should have foreseen that an interruption in the supply of current would result in loss to him.

In deciding in favor of Langley upon the issue of liability, the majority say that there is no necessity to decide the question as to the admissibility of the parol evidence "if under the written contract defendant assumed the duty to exercise reasonable diligence to notify plaintiff of any interruption in the supply of power." It has been held that "[i]n cases where it clearly appears that the jury did not rely upon the erroneous instructions, the judgment may be affirmed on the ground that the error is not prejudicial." (*Oettinger* v. *Stewart*, 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) But here the record does not show that situation. Instead, it presents a case tried by counsel for both parties solely as one for damages arising from the asserted breach of an oral contract to give notice.

The basis for the conclusion that the erroneous instruction as to the oral contract was not prejudicial is quite uncertain. Reference is made to *Heple* v. *Kluge*, 114 Cal.App.2d 473

[250 P.2d 694], in which it is stated that an erroneous instruction is not prejudicial " 'when the facts as to which the charge is made are admitted or uncontradicted, or where no other conclusion could be reasonably made from the evidence.' " (P. 483.)  Apparently, then, the power company is held liable upon the ground that, as a matter of law, the evidence shows a duty to exercise reasonable diligence to prevent damage by giving Langley reasonable notice of any interruption in the supply of power.

In challenging the propriety of the instruction which stated that it "was liable for any loss or damage occasioned by the interruption of power if such loss or damage was caused by the failure to exercise reasonable diligence," the power company points to the written contract which provides that "The Company will not be liable for interruption or shortage or insufficiency of supply, or any loss or damage of any kind or character occasioned thereby, if same is caused by inevitable accident . . . or any other cause except that arising from its failure to exercise reasonable diligence."

That this provision of itself does not create the duty stated in the instruction, apparently is conceded in the opinion in which it is stated: "These provisions deal with the duty to supply power, and they make clear that defendant is not an insurer or guarantor of service.  In no way, however, do they abrogate defendant's general duty to exercise reasonable care in operating its system to avoid unreasonable risks of harm to the persons and property of its customers.  (See Pub. Util. Code, § 451.)"  It appears, therefore, that the basis of the determination of liability is not a duty specifically created by the contract, but instead a general statutory one requiring a public utility to exercise reasonable care toward its customers, and the written contract is of importance only to prove such a relationship.

No case is cited which holds that a power company may be held liable for a failure to notify customers of an accidental interruption of the supply of electricity, as opposed to a situation where the company suspends the supply of power to effect repairs or for similar purpose. *Brame* v. *Light, Heat, & Water Co.*, 95 Miss. 26 [48 So. 728], and *Stroup* v. *Alabama Power Co.*, 216 Ala. 290 [113 So. 18, 52 A.L.R. 1075], are cases in the latter category.  Nor is such a charge made in the complaint, which alleges only that the "plaintiff and the defendant entered into an oral and written contract, whereby defendant . . . agreed that in the event it was neces-

sary to suspend temporarily the delivery of electric energy, said defendant would give a reasonable notice to plaintiff. . . ."

The complaint states no cause of action whatever, but the case was tried upon the theory that the power company had made an oral contract to give notice to Langley which it failed to fulfill. Evidence in support of such theory was received erroneously by the trial court and the jury instructed to return a verdict for Langley if it found that such a contract was made and breached. The jurors were also told that, by the written contract, the power company was liable to Langley for damages to his property because of a failure to exercise reasonable diligence "to notify him that the power was off." That instruction states a theory of recovery inconsistent with the one based upon an oral contract under which a failure to give notice was said to be inexcusable "by any circumstances."

It is now held that evidence offered to prove an oral contract might properly have been considered by the jury as the basis of liability upon the inconsistent theory of liability under the written contract. For that reason, the liability of the power company is said to now be established as a matter of law, under a theory not pleaded in the complaint nor relied upon by the parties at the trial and upon which the jury was not instructed.

Under certain circumstances, an appellate court may hold, as a matter of law, that specific conduct does or does not amount to reasonable care toward a plaintiff. (*Cf. Pirkle* v. *Oakdale Union Grammar Sch. Dist.*, 40 Cal.2d 207 [253 P.2d 1]; *Gray* v. *Brinkerhoff, ante*, p. 180 [258 P.2d 834].) But in those cases, the issue of the reasonableness of the conduct involved was presented by the pleadings and considered by the parties with full opportunity to present evidence upon it. The present record shows an entirely different situation.

I would reverse the judgment without qualification.

Appellant's petition for a rehearing was denied December 3, 1953. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.

Dooling, J. pro tem., did not participate therein.